McMILLAN, Presiding Judge.
The appellant, Daniel E. Kirby, was found guilty of driving under the influence. The trial court sentenced him to 12 months’ incarceration and then suspended the sentence for 2 years, conditioned upon the appellant’s staying out of trouble, cooperating with the court referral officer, and paying his fines and costs as scheduled.[1] The court also ordered the appellant to complete a substance-abuse program and suspended his driver’s license for six months.
The State’s evidence tended to show that appellant was stopped at a safety checkpoint roadblock in Houston County on May 7, 2000. A Game and Fish Department officer who was participating in the roadblock called Alabama State Trooper Michael Simmons over to the appellant’s vehicle, and Simmons noticed that the appellant had “very red eyes” and that there was the “strong odor of an alcoholic beverage” coming from his person. Simmons asked the appellant to perform several field-sobriety tests. When the appellant failed the tests, Simmons arrested him for driving under the influence. Kirby was transported to the Houston County jail, and a Draeger breath test was performed. The results indicated that the appellant’s blood-alcohol level was .10 percent. Kirby filed a pretrial motion to suppress a statement he made to Trooper Simmons and all of the evidence seized by the officers. He argued that “the roadblock was in violation of the Department of Public Safety rules and regulations” and that the results of the field-sobriety tests, blood-alcohol tests, and any statements were inadmissible because they were “fruits of the poisonous tree.” The trial court summarily denied the motion. The appellant and his wife testified at trial that the appellant had consumed no more than two beers at the time of the stop.
I.
The appellant contends that the trial court erred in failing to suppress the evidence seized as a result of the initial stop because, he says, the law-enforcement officials failed to comply with the regulations *583 concerning checkpoints. He argues that the vehicle-checkpoint sheet completed by Trooper Simmons[2] indicated that the roadblock did not comply with the regulations set by the Alabama Department of Public Safety for use by state troopers because it was not signed by the shift supervisor before the checkpoint roadblock was implemented. He argues that the relevant portion of the procedure manual for the Highway Patrol Division of the Department of Public Safety states in -policy order number 25 that “Highway Patrol Division supervisors will select or approve the time and location of each driver license and vehicle inspection checkpoint prior to the implementation of the checkpoint.”
Trooper Simmons testified that he had been assigned to complete the vehicle-checkpoint report for the May 7, 2000, roadblock. He explained that a sheet is completed after the checkpoint roadblock so that a record is made of all pertinent information, such as time, location, weather conditions, arrests made, and who was involved. He said that one person gathers the information, completes the sheet, signs it, and then submits it to the supervisor for his or her signature. He said that the supervisor’s signature on the vehicle-checkpoint report for the May 7, 2000, roadblock had been added after he submitted the document and that it appeared to be that of his supervisor.
Simmons testified that, before the checkpoint roadblock was implemented, another trooper called him on the radio and informed him that the supervising corporal had approved the checkpoint roadblock. Officers from another State agency, the Game and Fish Department, were present at the scene and cooperated in the checkpoint, which Trooper Simmons says further indicated that the checkpoint had been selected and approved in advance. In Michigan Department of State Police v. Sitz, 496 U.S. 444, 447, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the United States Supreme Court emphasized that roadblocks should be conducted under written “guidelines setting forth procedures governing checkpoint operations, site selection, and publicity” that left virtually no discretion to the officer in the field. “[S]tops [of vehicles] at fixed checkpoints or roadblocks are reasonable if they are carried out pursuant to a neutral and objective plan, are supported by a strong public interest, and are only minimally intrusive to the individual motorist.” Cains v. State, 555 So.2d 290, 293 (Ala.Crim.App.1989). The appellant has not shown that the vehicle checkpoint was unreasonable or that it was improperly conducted in the present case.
II.
The appellant contends that the trial court erred by admitting results from an “unapproved” breath machine into evidence. He argues that the Draeger Aleo-test 7110 MK III-C, the device used in this case, is not listed in the Alabama Administrative Code as an approved device for measuring" blood-alcohol levels. He argues that in City of Tuscaloosa v. Stalnaker, affirmed by unpublished memorandum (No. CR-01-0613, August 23, 2002) 868 So.2d -481 (Ala.Crim.App.2002) (table), the Tuscaloosa Circuit Court suppressed the results of an alcohol breath test performed using the Draeger Alcotest *584 7110 MK III-C. The circuit court judge in that case stated: “The test in this case being performed on a machine not approved by the Department of Forensic Sciences, evidence of the breath [-test results] are ordered suppressed.”
Section 32-5A-194(a)(l), Ala.Code 1975, provides that, in order to establish a proper predicate for the admission of breath-test results, the State must show that the test was administered in strict compliance with Chapter 370-1-1 of the regulations of the Alabama Department of Forensic Sciences, as contained in the Alabama Administrative Code. The list of the approved testing devices in the Administrative Code includes the “Draeger Alcotest 7110 MK III” but it does not include the “Draeger Alcotest 7110 MK III-C,” the device used in this case. The State called Dale Allen Carpenter, a forensic expert with the implied consent section of the Alabama Department of Forensic Sciences, to testify regarding the Draeger Alcotest 7110 MK III-C. Carpenter said that the 7110 MK III-C is “the same instrument” as the MK III but that, unlike the MK III, the MK III-C has a built-in modem. He explained that the “C” designates the enhanced modem capacity, and it does not affect the analytical capabilities of the machine. Carpenter said that the 7110 MK III-C is listed by the federal government as a “conforming product” and its results are accepted as reliable by the scientific community. Carpenter said that, although the MK III-C is not specifically listed in the Administrative Code, it is “an approved device by the Department of Forensic Sciences.”
In our unpublished memorandum, this court considered the City of Tuscaloosa’s appeal of the circuit court’s order suppressing the breath-test results from the Draeger Alcotest 7110 MK III-C. The circuit court had conducted an evidentiary hearing to determine the admissibility of the test results obtained on the 7110 MK III-C. The City argued that the 7110 MK III-C and the 7110 MK III were the same machine, but the City did not present any evidence at the hearing tending to establish this fact. After the court entered an order suppressing the test results, the City filed a motion to reconsider and submitted an affidavit and supporting exhibits from Dr. Carpenter, the same expert who testified in the present case. He presented essentially the same evidence in Stalnaker as in this case. In Stalnaker, we upheld the circuit' court’s suppression order because it was not clearly erroneous or palpably wrong at the time that it was entered. In our unpublished memorandum in Stalnaker,[3] we also stated:
“We note that our decision in this case should not be interpreted as a finding that the Draeger Alcotest 7110 MK III and the Draeger Alcotest 7110 MK III— C are different testing devices for the purposes of the Administrative Rules of the Department of Forensic Sciences. As discussed above, there were several problems with the City’s efforts to establish either a statutory predicate or a traditional evidentiary predicate. If the only issue before us had been whether Stalnaker’s breath-alcohol test was administered on an approved testing device, and had the City presented during the suppression hearing the evidence presented in support of its motion to *585 reconsider, our decision might well be different. Indeed, based on Dr. Carpenter’s affidavit and supporting exhibits, we question the correctness of the trial court’s ruling. However, based on the evidence presented at the suppression hearing, the trial court’s ruling was not clearly erroneous.”
(Emphasis omitted.)
The evidence of the State’s expert was timely presented to the trial court in the present case. Based on that evidence, the trial court’s decision to admit the breath-test results was not clearly erroneous or palpably wrong. Furthermore, the testimony of the State’s expert witness and Trooper Simmons was sufficient to establish a traditional evidentiary predicate for the admission of the breath-test results. See Ex parte Mayo, 652 So.2d 201 (Ala.1994), and Moore v. State, 442 So.2d 164 (Ala.Crim.App.1983). The trial court’s decision to admit the breath-test results was not clearly erroneous or palpably wrong. Its judgment is affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.

. The court ordered the appellant to pay a $600 fine, a $50 crime victims’ assessment, and court costs.

. The appellant’s Exhibit 1 at trial was a copy of the checkpoint report that had been signed by Trooper Simmons but not by the shift supervisor. The State’s exhibit 3 was a copy of the same report with the supervisor’s signature. Trooper Simmons explained that it was his practice to make a copy of his completed report before he submitted it to the supervisor.

. Rule 54(d), Ala. R.App. P., provides that an unpublished memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used in any Court within this state, except for the purpose of establishing the application of the doctrine of the law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar.” We cite this passage merely to show the different circumstances in Stalnaker.